NORTHCUTT, Judge.
The circuit court rendered an order that adjudicated two-year-old J.H. to be a dependent child and placed her with her maternal grandmother. The child’s parents, J.W.H., Sr., and S.M., have filed sep-ai'ate appeals in which they contend that the evidence failed to prove that they neglected their daughter. We have consolidated their cases sua sponte.
A dependency determination is a mixed question of law and fact. The court’s order will be sustained on appeal if the court applied the correct law and the ruling is supported by competent substantial evidence in the record. S.G. v. Dep’t of Children & Family Servs. (In re I.B.), 946 So.2d 650, 652 (Fla. 2d DCA 2007) (citing R.F. v. Fla. Dep’t of Children & Families (In re M.F.), 770 So.2d 1189, 1192 (Fla.2000)). In this case, we reverse the dependency order because the evidence did not support it.
The dependency proceeding had its genesis in an anonymous telephone call to the Department of Children and Family Services’ abuse hotline in the late-night hours of February 4, 2006. The caller made several complaints about the parents’ care of J.H. that have never been substantiated. Pertinent to this appeal, however, the caller also claimed that J.H. was underweight to the point that she looked “like a skeleton with her skin on.” The Department sent a child protection investigator to the family’s home around two o’clock in the morning of February 5, 2006. The investigator spoke with the parents and examined the child. She did not think J.H. was dangerously underweight. Rather, she found a small but healthy-looking child with a “round and rosy” face. The responding investigator did not remove J.H. from the home, but she obtained the name of the child’s pediatrician.
The case was then assigned to a different investigator, who reviewed the family’s history. She became concerned when she learned that, some years before, S.M.’s older daughter from a previous relationship had been removed from S.M.’s home and placed with the maternal grandmother. The investigator asked the parents to permit a home visit. J.W.H. agreed, but citing his hectic work schedule, he asked her to call him to make an appointment. He also gave the investigator permission to contact J.H.’s pediatrician.
The pediatrician’s office told the investigator that J.H. was underweight and was characterized as failing to thrive.[1] Without seeing J.H. for herself or reviewing the child’s medical records, the investigator convinced the local Child Protection Team (CPT) to examine her. (The CPT initially refused to examine the girl because she was already under a doctor’s care.) The *1212 investigator arranged for S.M. to take the girl to the CPT appointment the next morning. At the CPT exam, J.H. was found to be undernourished and failing to thrive. She was referred to a growth clinic, which the mother agreed to attend.
Apparently, S.M. had failed to mention the CPT appointment to the child’s father. Upon learning of the examination and the growth clinic referral, J.W.H. made an angry telephone call to the investigator to complain that he had not been consulted. The investigator attempted to explain the need for the referral, but the father declared that his child would not be seen without a court order. Later that day, the Department sheltered J.H. and placed her with her maternal grandmother.
In March 2006, the Department filed a dependency petition alleging that the parents neglected J.H. by depriving her of necessary food and medical treatment.[2] See § 39.01(43), Fla. Stat. (2006). At the hearing on the petition in mid-June 2006, the Department presented the testimony of the second child protection investigator, who described the previously detailed events leading to the decision to remove J.H. from her parents’ home. The Department’s only other witness was Dr. Carol Lilly, an expert in pediatric undernutrition. Dr. Lilly had examined J.H. and counseled the family at the growth clinic after the CPT’s referral. (
Dr. Lilly first examined and evaluated J.H. in March 2006. J.H.’s height was in the normal range for a two-year-old, but her weight was far below normal. Dr. Lilly performed several laboratory tests in search of an organic factor — a chronic illness, a biological problem, or a physiological symptom- — that might be the cause of J.H.’s low weight gain. She found nothing. She diagnosed J.H. with mild to moderate chronic undernutrition and developmental delay. Dr. Lilly continued to monitor J.H.’s weight at the growth clinic and referred her to Early Steps to address the developmental delays.
Dr. Lilly’s determination that J.H. had a chronic condition was based on her review of the records maintained by J.H.’s pediatrician. They reflected that J.H.’s weight gain began decreasing when she was six months old. The pediatrician recommended that the parents give J.H. high calorie supplements. Later, he referred the parents to the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) to obtain additional nutritional boosters. The pediatrician’s records did not detail what, if any, counseling was given to the parents, nor did they reflect whether the doctor was concerned with what the parents were or were not doing to address J.H.’s poor weight gain. Dr. Lilly expressed surprise that the records did not mention J.H.’s developmental delays, which should have been noticed in a typical pediatric screening. Dr. Lilly did not speak with the pediatrician, nor did the Department call him as a witness in the dependency hearing.
Dr. Lilly met with S.M. and other family members at the growth clinic. She never met J.W.H. because the shelter order effectively prohibited him from attending the appointments. At the first visit, Dr. Lilly was concerned that the mother and the maternal grandmother did not fully appreciate J.H.’s problems. On subsequent visits, Dr. Lilly noted that the family did not appear to understand or follow through with the recommendations of the clinic. Dr. Lilly thought that the family needed help with organizing and adhering to feeding schedules for J.H. She testified that *1213 maintaining a routine is important in encouraging a young child to eat regularly. The pediatrician’s records did not indicate that the family had been previously instructed on these tasks. Further, the mother and the grandmother were slow to accept the referral to Early Steps to address J.H.’s developmental delays, and they declined home services.
The parents testified in opposition to the petition. Both acknowledged that they had known of their daughter’s weight problem. But they asserted that they had followed all of their pediatrician’s recommendations. They gave the child high-calorie supplements such as PediaSure and took her to WIC when referred. Both parents testified that S.M. had taken J.H. to the pediatrician regularly and had reported to J.W.H. that the baby was fine and just a little underweight. Indeed, both parents thought J.H. was doing well.
J.W.H. testified that he regretted his hostile telephone call to the child protection investigator in which he initially refused services. He explained that he made the call because he was upset when he learned that the investigator, who had promised to contact him to schedule a home visit, had instead arranged the CPT appointment without consulting him. Since then, he testified, he had encouraged the mother to fully comply with all the agencies’ recommendations for J.H.[3]
To justify this dependency based on neglect, the Department was required to prove by a preponderance of the evidence that J.H. was “deprived of, or [was] allowed to be deprived of, necessary food ... or medical treatment” or that she was “permitted to live in an environment when such deprivation or environment causes the child’s physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired.” §§ 39.01(43), .507(l)(b). In its dependency order, the circuit court found that the Department had proved that “the parents had neglected this infant by failing to provide her with proper medical care.” To the extent that this statement can be read as finding that the parents did not take J.H. to a doctor when needed, or did not follow the doctor’s advice, it is not supported by the evidence. Other than Dr. Lilly’s testimony, the Department presented no evidence on this topic. Both Dr. Lilly’s review of the pediatrician’s records and the parents’ testimony established that, in fact, the child received regular medical care.
The circuit court also found that the “parents did not follow up” with their pediatrician’s referral to WIC. But the only evidence on this point, the parents’ testimony, established that they did seek the services of WIC. The Department’s evidence did not at all dispute this testimony. No one from WIC testified, and the pediatrician’s records mentioned only that the parents had been referred to the program, not whether they had accepted the referral.
Moreover, Dr. Lilly testified that J.H.’s rate of weight gain had increased during the six months preceding the Department’s intervention. There was no evidence to suggest that J.H.’s progress dur *1214 ing that period fell shy of the reasonable expectations of the WIC program. Ironically — and, perhaps, tellingly — in the months since J.H. was sheltered and sent to the growth clinic, her rate of weight gain had declined. In short, the court’s finding that the parents neglected J.H. by failing to provide her with medical care was unfounded. Cf. Dep’t of Children & Families v. K.F., 916 So.2d 948 (Fla. 4th DCA 2005) (affirming termination of parental rights when, among other reasons, the child had received no medical care or immunizations).
As mentioned, the petition for dependency also alleged that the parents had neglected J.H. by depriving her of necessary food, and many of the circuit court’s findings focused on J.H.’s undernutrition. See § 39.01(43). But the decisions that have approved terminations of parental rights and dependencies on this basis, M.J.S. v. State, Department of Children & Family Services (In re D.J.W.), 764 So.2d 825 (Fla. 2d DCA 2000); K.F., 916 So.2d at 950; and Hardy v. Department of Health & Rehabilitative Services, 568 So.2d 1314 (Fla. 5th DCA 1990), have involved a quantum of evidence that was lacking here.
As in this case, the mentioned authorities all involved children’s failures to thrive. The Hardy court explained that “[t]he only way to confirm a diagnosis of nonorganic failure to thrive is to place the child in a more nurturing environment and see if the child begins to grow. If so, the subsequent growth confirms the diagnosis.” 568 So.2d at 1315. Thus, in Hardy, nonorganic failure to thrive was proved because the child lost weight while in his parents’ care and then gained 1.5 pounds and grew two inches while in foster care. Here, in contrast, J.H. was actually gaining more weight in her parents’ care than she did after she was sheltered. In M.J.S., 764 So.2d at 827, the medical evidence established that the child weighed less in 1998 than he had in 1995. Although J.H.’s rate of weight gain began decreasing when she was six months old, she never lost weight.
Additionally, in M.J.S. and K.F., the evidence proved that the parents had actually deprived their children of food. In M.J.S., the mother had told others that she withheld food from her child. 764 So.2d at 827. In K.F., an eighteen-month-old child exhibited signs of starvation, and the child’s sibling had died of starvation. 916 So.2d at 949. Here, there was no evidence that J.W.H. or S.M. withheld food from J.H. Indeed, the fact that J.H. was gaining weight before she was sheltered contradicted any such notion.
To be sure, J.W.H and S.M. were mistaken to believe that J.H. was “fine” and just a “little underweight.” But the evidence established that before the Department became involved, the parents regularly took J.H. to her pediatrician and followed his recommendations as they understood them, and that J.H. was gaining weight in their care, albeit not enough. The parents may have needed help in setting a feeding schedule and an eating routine for J.H., as Dr. Lilly believed, but the Department presented no evidence that they had failed to follow their pediatrician’s advice.
In White v. Department of Health & Rehabilitative Services (In re C.W.), 490 So.2d 175, 176 (Fla. 5th DCA 1986), the Fifth District reversed a dependency order based on neglect because the evidence failed to demonstrate that the child had been willfully deprived of food. Instead, the evidence showed that “the mother, through lack of education and experience, rather than through neglect and mistreatment, [had] failed to provide what the state considers adequate feeding for the baby.” Id.; see also M.B. ex rel. A.F. v. *1215 Dep’t of Children & Families, 785 So.2d 1240 (Fla. 5th DCA 2001) (concluding that circuit court erred in finding child dependent when child’s weight loss was attributed to mother’s poor education). At most, that is what the Department proved in this case. It failed to present competent, substantial evidence that J.W.H. and S.M. neglected their child.
Reversed.
ALTENBERND and VILLANTI, JJ„ Concur.

. Failure to thrive is
weight consistently below the 3rd to the 5th percentile for age, progressive decrease in weight to below the 3rd to 5th percentile, or a decrease in the percentile rank of 2 major growth parameters in a short period. The cause may be an identified medical condition or related to environmental factors. Both types relate to inadequate nutri-lion. Treatment aims to restore proper nutrition.
Mark H. Beers, Robert S. Porter, & Thomas V. Jones, The Merck Manual of Diagnosis and Therapy 2395 (18th ed.2006). The Merck Manual refers to failure to thrive stemming from a medical condition as “organic,” while environmental factors produce “nonorganic” failure to thrive. Id.

. The petition contained a second count, which the Department withdrew at the close of the dependency hearing after failing to offer any evidence in support of it.

. In its order, the circuit court wrote that J.W.H. "excused his behavior and blamed others for the child’s removal. The Court does not find him a credible witness." It is unclear whether this last observation referred specifically to J.W.H.'s attempts to shift responsibility or to his testimony generally. But his testimony about J.H.'s regular medical care and the couple's attempts to follow the pediatrician's recommendations was undisputed. Indeed, it was corroborated by S.M. and, in material respects, by the testimony of Dr. Lilly. See Republic Nat’l Bank of Miami, N.A. v. Roca, 534 So.2d 736, 738 (Fla. 3d DCA 1988) ("A trial court cannot arbitrarily reject unrebutted testimony.”).